**MIDWEST RESEARCH INSTITUTE, a Missouri Corporation, Plaintiff,**

v.

**S & B PROMOTIONS, INC., The Joe Land Co., Inc., and Dr. Robin Tyre & Associates, Inc., and Midwest Research of Michigan, Inc., Defendants.**

No. 87–0853–CV–W–8.

United States District Court,
W.D. Missouri, W.D.

Jan. 22, 1988.

John R. Cleary and Daniel J. Ross, Linde Thomson Fairchild Langworthy Kohn & Van Dyke, Kansas City, Mo., for plaintiff.

John C. McMahon, Litman, McMahon & Brown, Kansas City, Mo., Mary E. Royce, Bowden V. Brown, Dykema, Gossett, Spencer & Goodnow, Bloomfield Hills, Mich., for defendants S & B Promotions,

Inc. and Midwest Research of Michigan, Inc.

David Lee Wells, North Kansas City, Mo., J. Edward Hollington, Albuquerque, N.M., for defendants The Joe Land Co., Inc. and Dr. Robin Tyre & Associates, Inc.

## MEMORANDUM OPINION AND ORDER

STEVENS, District Judge.

Plaintiff in the above-styled case brought this six-count complaint alleging violations of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a), common law unfair competition and trademark infringement and violation of the Missouri Anti-Dilution Statute, Mo. Ann. Stat. § 417.061 (Vernon 1986). The court heard evidence on plaintiff's claims in a hearing on November 18, 1987. Defendants presented their evidence to the court on November 24, 1987. The parties agreed that, pursuant to Fed. R. Civ. P. 65(a)(2), the preliminary injunction hearing would be consolidated with the trial on the merits. As a result, the case is currently before the court on plaintiff's motion for a permanent injunction and, on defendant S & B Promotions, Inc.'s counterclaim for cancellation of trademark.[1]

Midwest Research Institute ("MRI") is an independent, not-for-profit Missouri corporation with its principal place of business in Kansas City, Missouri. Since its founding in 1944 the corporation has operated under and used the names "Midwest Research Institute," "Midwest Research" and "MRI." MRI maintains its headquarters in Kansas City, Missouri and the evidence establishes that it has become well and commonly known by those names or marks. Other offices are located in Raleigh, North Carolina; Osceola, Iowa; Jefferson, Arkansas; Washington, D.C. and Riyadh, Saudi Arabia. In addition to these offices, MRI manages and operates the National Solar Energy Research Institute in Golden, Colo-

rado.[2] MRI employees in each of these offices perform scientific research and development on a national basis in fields such as the physical sciences, biological sciences, biobehavioral sciences, mathematics, engineering sciences and economic and management sciences. The research is performed for business, industry and government. John Dinwiddie, senior vice president of MRI, testified at the preliminary injunction hearing that approximately seventy-five percent of MRI's research in Kansas City is for the federal government clients. He also stated that less than one percent of the Institute's work was for walk-in clients.

During cross-examination Dinwiddie admitted that the name Midwest Research Institute was somewhat descriptive of the Institute's work. He added that originally the primary focus of the Institute was to encourage economic and social growth in the midwest through the application of science and technology. MRI's initial research concentrated on projects affecting Missouri and the six surrounding states. Today, the Institute's work is more national in scope, but Dinwiddie said that research focusing on the midwest section of the country was still a fundamental and primary purpose of the corporation's existence.

The Institute obtained the service mark "MRI," reg. no. 920,883, on September 21, 1971. On January 13, 1987 the United States Patent and Trademark Office registered the service mark "Midwest Research Institute" as reg. no. 1,425,251. When plaintiff requested the second trademark it acknowledged that it claimed no rights to the words "research institute" and that the word "midwest" was the nondescriptive part of the mark. MRI's Application for Trademark Registration, Defendants' Exhibit No. 3.

Defendant S & B Promotions, Inc.[3] is a Michigan corporation, with headquarters in

---

1. Defendant the Joe Land Company suggests in its response to plaintiff's motion for preliminary injunction that plaintiff's trademark should be cancelled. Joe Land never filed a counterclaim for cancellation of trademark, however.

2. The Solar Energy Research Institute is under contract to the United States Department of Energy.

3. Defendant Midwest Research of Michigan, the successor in interest to S & B, was added as a

Walled Lake, Michigan. S & B is involved in the production and sale of subliminal self-help tapes, marketed under the trademark "SCWL," which was registered on July 13, 1982 as reg. no. 1,200,890. SCWL stands for "subconscious to conscious way of learning."

Owen Stitz, president of S & B Promotions, testified that S & B assumed the name Midwest Research, Inc. soon after the company was founded. Stitz stated that the name Midwest Research, Inc. seemed more appropriate since the company was located in the midwest and performed subliminal research. The name change was also partially motivated by the fact that Stitz and his partner did not like the connotation carried by the word "promotions." Thus, from 1979 to May or June of 1987, S & B operated under the name "Midwest Research." In May or June of 1987 the Company incorporated under the name Midwest Research of Michigan, Inc., although the company apparently still calls itself "Midwest Research."

Plaintiff introduced several examples of S & B's use of the name "Midwest Research." For example, plaintiff introduced an envelope sent by United Parcel Service on October 21, 1987, after the corporate name was officially changed to Midwest Research of Michigan, Inc. The mailing label on the envelope says "Midwest Research, Inc." Plaintiff's Exhibit No. 22. Similarly, Mr. Stitz testified in his deposition that a "personal improvement technology report," printed by his company, often referred to the corporation as "Midwest Research" or "Midwest Research, Inc." Plaintiff's Admissions of Defendant S & B Promotions at 2. Finally, Stitz stated that the sign identifying his building in Michigan reads "Midwest Research." *Id.* at 9.

Perhaps most important to the court's resolution of the present case, however, is S & B's use of the words "Midwest Research" on the tapes it sells across the country through advertisements and a distributorship network. At trial, plaintiff introduced examples of four of the audio tapes manufactured by S & B. Each is identified on the cassette by the words "Midwest Research" or "Midwest Research, Inc." The size of this identification varies by tape.[4] In addition, the audio portion of each tape begins with a voice announcing the title of the tape, the tape number and the fact that the tape is "by Midwest Research."

Defendant The Joe Land Company ("Joe Land") was one of S & B Promotions' distributors. Joe Land had an agreement with S & B giving Joe Land the exclusive marketing rights to the S & B tapes. Both Joe Land and S & B agree that the exclusivity portion of this agreement ended in July 1987. Indeed, Joe Land is no longer affiliated with S & B in any way. The company, however, does maintain some of S & B's tapes for replacement purposes. These tapes are identified with the words "Midwest Research." Other than these inventory tapes, Joe Land sells only its own tapes which do not mention any affiliation with Midwest Research. Defendant Dr. Robin Tyre was Joe Land's distributor in the Western Missouri area.[5] Dr. Tyre testified that he has not received any tapes with "Midwest Research" on them since July 1987. Plaintiff alleges that defendants Joe Land and Dr. Tyre infringed on its trademark by distributing copies of the S & B tapes which mentioned "Midwest Research" or "Midwest Research, Inc."

I. *Plaintiff's Statutory and Common Law Trademark Infringement Claims*

Count I of plaintiff's complaint alleges that defendants violated section 32 of the Lanham Act, 15 U.S.C. § 1114, by using

---

party on November 30, 1987. For purposes of clarity in this order the court will refer to Midwest Research of Michigan as S & B since both plaintiff and Midwest Research of Michigan commonly refer to themselves as "Midwest Research."

**4.** For example, the words "Midwest Research, Inc." are larger on Plaintiffs' Exhibit Number 2,

"Super Weight Loss," than on Plaintiff's Exhibit Number 1, "Effective Communication." The type on Plaintiff's Exhibits 3 and 4 is even smaller. Exhibits 3 and 4, however, are packaged in material which has "Midwest Research" identified in large type.

**5.** Dr. Tyre's sales district also includes areas outside of Missouri.

the words "Midwest Research" [6] on their subliminal tapes. Count IV of the complaint makes similar allegations based on the common law of trademark infringement. Both the statutory and common law claims are premised on the theory that defendants' use of the words "Midwest Research" is confusingly similar to plaintiff's "Midwest Research Institute" trademark and that the similarity is likely to confuse the public as to the source or origin of defendants' subliminal tapes.

■ The primary allegation in Count I is that the registration of plaintiff's marks with the United States Patent and Trademark Office presents "prima facie evidence" that the marks are distinctive. This claim is based on 15 U.S.C. § 1057(b) which provides

a certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registration, registrant's ownership of the mark, and of registrant's exclusive right to use the mark in commerce *in connection with the goods or services specified* in the certificate, subject to any conditions and limitations stated therein. (emphasis added)

Defendants' Exhibit No. 3, the application for registration of the trademark, as well as Plaintiff's Exhibit No. 17, the certificate of registration, specifically state that the service mark is issued for "research and consultation in the fields of the physical sciences, biological sciences, mathematics, engineering sciences, and economics and management sciences...." Thus, as defendant Joe Land noted in its response to plaintiff's motion for a preliminary injunction, plaintiff cannot obtain relief under 15 U.S.C. § 1114 unless defendants' use of the allegedly infringing mark was made in regard to the services specified on plaintiff's trademark registration certificate. Since defendants are engaged primarily in the sale of goods [7] and plaintiff's certificate is specifically limited to certain scientific research services, this court cannot find that

defendants have violated the Lanham Act and statutorily infringed on plaintiff's federally registered mark.

The same is not true, however, for plaintiff's Count IV common law trademark infringement claim. Defendants contend that plaintiff is not entitled to any protection under general theories of trademark law because the name Midwest Research Institute is merely descriptive and, therefore, not entitled to protection. Plaintiff, of course, refutes this contention and argues that the name is arbitrary or, alternatively, that it has acquired secondary meaning. The determination of whether the mark Midwest Research Institute is descriptive or arbitrary is important because the more arbitrary or fanciful a trademark is, the greater protection it receives.

Trademarks can fall into "one of four categories: (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful." *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1325 (8th Cir.1984). If plaintiff's mark is descriptive, as suggested by defendants, it is "protectable only if shown to have become distinctive, that is, shown to have acquired a secondary meaning." *Co–Rect Products v. Marvy! Advertising Photography, Inc.*, 780 F.2d 1324, 1329 (8th Cir.1985) (other citations omitted). A descriptive mark is one that merely "designates the characteristics, qualities, effects, or other features of the product...." *Id.* at 1329.

Defendants are correct in arguing that Midwest Research Institute is a geographically descriptive term insofar as it "designates geographical locations and would tend to be regarded by buyers as descriptive of the geographical location of the origin of the goods or services." J. Thomas McCarthy, *Trademarks and Unfair Competition* (2d Ed. 1984) at § 14:2. *See also Black Hills Jewelry Manufacturing Co. v. Gold Rush, Inc.*, 633 F.2d 746, 752 (8th Cir.1980) (term is geographically descriptive if the product is manufactured in that geographical area, establishing an association with the area). Indeed, Mr. Din-

---

**6.** Some tapes were identified with the words "Midwest Research, Inc."

**7.** *See infra* at 1015 for a discussion of the service aspect of defendants' business.

widdie testified on cross-examination that the word Midwest described the geographic location of much of the Institute's research. This testimony is especially important since, as noted earlier, plaintiff's trademark registration stated that the word Midwest was the descriptive part of its trademark. In order, then, for plaintiff to prevail on its infringement claim it must show that although the term Midwest Research Institute is geographically descriptive, because it describes the location of the institute as well as the original focus point of the institute's research,[8] it has also achieved secondary meaning. The old Court of Customs and Patent Appeals explained that a company

> might develop a protectable good will in such a geographically descriptive name upon proof that the name ceased being informational to the public and came to indicate a source of goods. Thus, if a manufacturer located in Chicago were to display the name CHICAGO on his shirts, for example, it has been the law for over a century that he could prevent another subsequent use only if he could establish 'secondary meaning' in the term.

*In re Nantucket, Inc.*, 677 F.2d 95, 102–103 (C.C.A.1982). A footnote to the court's decision in *Nantucket* states that the geographically descriptive term acquires secondary meaning when it becomes the trade denomination of the service or product made by the trademark holder. *Id.* at 103, footnote 3 (citing *Montgomery v. Thompson*, [1891] Ac. 217; *Wotherspoon v. Currie*, L.R.5 E. & I. App. 508, 521–22 (1872)).

A similar result was reached in the seminal case of *American Waltham Watch Co. v. United States Watch Co.*, 173 Mass. 85, 53 N.E. 141 (1899). Plaintiff in *American Waltham* was the first manufacturer of watches in Waltham and had long identified his watches as "Waltham Watches." Although the name was first used to identify the geographical location of where the watches were made, the court noted that the "long use in connection with the plain-

tiff's watches, has come to have a secondary meaning as a designation of the watches which the public has become accustomed to associate with the name." *Id.* 53 N.E. at 142. The defendant argued that since it made watches in Waltham it should have a right to identify its watches as coming from that city. In an opinion by Justice Holmes the court held that

> "[w]hatever might have been the doubts some years ago, we think that now it is pretty well settled that the plaintiff, merely on the strength of having been first in the field may put later comers to the trouble of taking such reasonable precautions as are commercially practicable to prevent their lawful names and advertisements from deceitfully divesting the plaintiff's custom."

*Id.* Thus, while the court found that "a man cannot appropriate a geographical name," it held that when a geographical name has come to be identified with a particular product or service the individual first using that name has superior rights and, in the event of confusion, the second comer to the field could be required to place a disclaimer on its goods or services so that the original user could protect its acquired good will.

Initially, the court notes that Midwest Research Institute has acquired the type of good will mentioned by Justice Holmes in *American Waltham*. The company has been using the name since 1944 and in the years since that time it appears that both scientists and lay people have recognized the name Midwest Research as that of the nonprofit organization located in Kansas City, Missouri which performs scientific research. For example, Mary Cook, a Ph.D. in biological psychology and an employee at MRI for the past thirteen years, testified that she moved from Pennsylvania to work at MRI because of the Institute's reputation for creative work. Similarly, Duane Sunderman, a chemist at MRI, testified that when he previously worked at Battelle Memorial Institute in Columbus, Ohio he

---

**8.** The original focus of MRI's research was on projects arising in the midwest section of the country. *See supra* at 1009.

consistently heard about work done at Midwest Research Institute. He testified that during his twenty-eight years at Battelle he had high regard for Midwest Research and both worked with and competed against the employees of the Institute for various grant projects. From the testimony of these two individuals the court concludes that on a professional basis individuals who hear the name "Midwest Research" associate it with the nonprofit organization based in Kansas City that performs scientific research in a variety of areas.

In addition, George Michael Huke, the editor of *KC Delta Digest*, the newsletter of an organization composed of small business entrepeneurs, testified that when he heard about the tapes sold by a Dr. Tyre who was affiliated with "Midwest Research" he assumed that Dr. Tyre worked for Midwest Research Institute and not for Midwest Research of Michigan.[9] Dr. Tyre spoke about the tapes at one of the group's meetings. Huke testified that he first learned that Tyre was not affiliated with MRI when a member of his organization asked Dr. Tyre if the Midwest Research which manufactured the subliminal tapes was Midwest Research Institute of Kansas City. Thus, at least one other individual in the group listening to Dr. Tyre's speech associated the words "Midwest Research" with Midwest Research Institute of Kansas City. The testimony of these professionals and lay people[10] strongly supports a find-

ing that when associated with the "Research Institute" part of plaintiff's trademark, the word "Midwest,"[11] although geographically descriptive, has not only acquired good will, but has also achieved the secondary meaning required for a geographically descriptive term to be protected under common law trademark theories.[12]

 The mere fact that the mark Midwest Research Institute has acquired secondary meaning does not necessarily mean that plaintiff can succeed on its infringement claim. It must also show that the public would be likely to confuse the services provided by Midwest Research Institute with the subliminal tapes marketed by Midwest Research of Michigan. The Eighth Circuit has noted a number of factors to consider in determining whether a likelihood of confusion exists. For example, in *WSM, Inc. v. Hilton*, the Eighth Circuit affirmed the district court's finding that the question "of whether there is a likelihood of confusion requires an application of several factors to the particular facts of [the] case." *WSM*, 545 F.Supp 1212, 1217 (W.D.Mo.1982), *aff'd* 724 F.2d 1320 (8th Cir.1984). In determining whether a likelihood of confusion exists, a court should consider the similarity and appearance of the marks; the degree of care used by purchasers of both plaintiff's and defendant's goods or services; the intent of the defendant and the existence of actual con-

---

**9.** It should be noted that Dr. Tyre actually served as a distributor for the Joe Land Company and has no direct relationship with S & B or Midwest Research of Michigan.

**10.** The court notes that Dr. Tyre testified that he had never heard of Midwest Research Institute. While the court has not ignored his testimony, it notes that a term does not need to achieve one hundred percent recognition in order to acquire secondary meaning.

**11.** Defendants placed much emphasis on the fact that the word "Midwest," standing alone, is geographically descriptive. The validity of a mark, however, "must be determined by looking at the mark as a whole." McCarthy, *Trademarks and Unfair Competition, supra* at § 13.10. Thus, the term "California Cooler" was found to have secondary meaning although "California" was geographically descriptive and "cooler" was generic, because "a composite geographical mark should not be dissected into its parts to

determine whether it is primarily geographical or not. It is the likely reaction of customers to the total mark that is at issue." *California Cooler v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1455 (9th Cir.1985) (citations omitted).

**12.** Defendants also try to argue that since several other companies use the words "Midwest Research" in their names, the mark is weak and, therefore, is not entitled to protection. The Ninth Circuit recently rejected a similar argument, noting that "[f]requency of use ... is not the proper standard. Instead we must consider the specific associations that the composite mark triggers in the minds of consumers...." *Rodeo Collection, Ltd., v. West Seventh*, 812 F.2d 1215, 1218 (9th Cir.1987). As discussed, *infra*, consumers are apparently confused as to the source of the tapes marketed by Midwest Research.

**1014**

fusion. *Id. See also John Deere and Co. v. Payless Cashways, Inc.,* 681 F.2d 520, 524 (8th Cir.1982) (court considered similarity of marks, relation in use between each parties' goods, manner of marketing and degree of care used); *Emerson Electric Co. v. Emerson Quiet Kool Corp.,* 577 F.Supp. 668, 676 (E.D.Mo.1983) (when determining likelihood of confusion, a court should consider similarity of marks, similarity and competitive proximity of products, relationship between parties' channels of trade, relationship between parties' advertising, degree of care likely to be used by consumers, evidence of actual confusion, defendant's intent in adopting the mark and strength of the plaintiff's mark). In addition, direct competition between the parties is not required to find likelihood of confusion. *Mutual of Omaha Insurance Co. v. Novak,* 836 F.2d 397, 399–400, (8th Cir.1987).

When these factors are considered in the present case it becomes evident that a likelihood of confusion exists. The name "Midwest Research Institute" is similar to "Midwest Research of Michigan" and "Midwest Research, Inc.," especially since both corporations are commonly referred to as "Midwest Research." Second, although the sale of goods would initially appear to be distinct from the services provided by plaintiff, the fact that defendant engages in subliminal research increases the similarity between the products of the two parties. In addition, a portion of the testimony [13] centered on the actual confusion of defendants' customers who wrote to plaintiff, believing that MRI was the source of defendants' tapes.

In addition to considering these various factors, the Eighth Circuit has noted that "confusion, in the legal sense means confusion of source." *Vitek Systems, Inc. v. Abbott Laboratories,* 675 F.2d 190, 193 (8th Cir.1982) (quoting *Fisher Stokes, Inc. v. All Nighter Stove Works,* 626 F.2d 193, 195 (1st Cir.1980). This court has previously cited this precedent, noting that the confusion which a plaintiff must prove "may be confusion to product source, or confu-

sion to sponsorship or affiliation." *Hallmark Cards, Inc. v. Hallmark Dodge, Inc.,* 634 F.Supp. 990, 998 (W.D.Mo.1986).

Evidence presented at the two-day preliminary injunction hearing convinces the court that confusion about product source or affiliation exists in the present case. For example, the testimony of Mr. Huke, the editor of *KC Delta Digest,* supports a finding that individuals unfamiliar with the source of defendants' tapes believed that the tapes were somehow sponsored by or affiliated with Midwest Research Institute. In addition, the testimony of Mary Cook, the Ph.D. in biological psychology, further shows that people believed that defendants' tapes were affiliated with MRI. Cook testified that she had received inquiries from colleagues as to whether MRI had begun research into the area of subliminal tapes. In addition, she testified that her mother had asked her if the Institute was involved in the production of the subliminal tapes.

Perhaps most important to the court's finding that a likelihood of confusion exists, however, is the packet of over thirty letters, submitted as Plaintiff's Exhibit No. 10, inquiring as to whether MRI is the source of the subliminal tapes that the authors of the letters have seen advertised. In addition to the letters, plaintiff submitted a log of telephone calls received by MRI from individuals inquiring as to the source of the tapes. Greta O'Keefe, the director of communications for MRI, testified that she began keeping a log of all phone calls and clippings she received about the subliminal tapes in July 1986. This log illustrates that inquiries have come from across the United States at a rate of anywhere from once a month to ten times in one month. While some of the individuals who called said that they first heard of the tapes from Joe Land, they all called MRI because they thought the company could have been the "Midwest Research," identified as the source of the subliminal tapes.

Defendants urge the court to find that these letters, phone calls and clippings are

**13.** *See, infra,* at 1014–15.

not evidence of likelihood of confusion because several of the people inquiring about the tapes found MRI's address by looking through general business indexes in public libraries. The court does not accept this argument since, as noted earlier, likelihood of confusion includes confusion as to product source, sponsorship or affiliation. If, after reading brief summaries of the kind of business services provided by MRI, these individuals believed that the Institute could be the source of the tapes, the mere fact that the people searched through a reference directory in a library is not important. The callers and authors of letters were still confused as to the source of the tapes. Even if this evidence left the court with a doubt [14] as to whether confusion exists, that doubt must be decided against the newcomer, in this case S & B. *Armstrong Cork Co. v. Armstrong Plastic Covers, Inc.*, 434 F.Supp. 860, 870 (E.D.Mo. 1977).

In addition to the confusion evidenced by the various letters, phone calls and clippings, the court believes additional confusion exists because of the research activities undertaken by defendant S & B. Owens Stitz, the corporate representative of defendant Midwest Research of Michigan testified at a deposition taken pursuant to Fed. R. Civ. P. 30(b)(6) that his organization was involved in research of subliminal techniques. He further testified that his company works with psychologists, research organizations and universities in designing projects about the effectiveness of subliminal suggestion in areas such as stress, effective speaking, smoking and various diseases. Plaintiff's Admissions of Defendant S & B Promotions, Inc., at 3–6. During cross-examination at the hearing Stitz said that his company was currently involved with approximately thirty research studies. Finally, he testified that the name Midwest Research of Michigan was chosen because of the organization's keen interest in research projects.

The court believes that this continual emphasis on research furthers the finding that a likelihood of confusion exists in this situation. Not only do individuals across the country believe that plaintiff is the source of defendants' tapes, but defendant is engaging in a variety of research projects substantially similar to some of plaintiff's projects.[15] This similarity of services is further evidence of a likelihood of confusion.

The evidence discussed above convinces the court that not only has Midwest Research Institute obtained the requisite secondary meaning to obtain trademark protection, but a likelihood of confusion exists between the mark Midwest Research Institute and defendants' use of "Midwest Research" or "Midwest Research, Inc." The court finds, as did Justice Holmes in *American Waltham*, that plaintiff is entitled to common law trademark protection for being the first to use the mark, even though it is geographically descriptive and defendant also has a right to use the work "Midwest." *American Waltham*, 53 N.E. at 142. Since defendants' use of the word "Midwest" describes the location and source of its goods, the court cannot, and will not, enjoin defendants from the use of "Midwest Research, Inc." or "Midwest Research of Michigan." *See* McCarthy, *supra* § 14:7 at 637 ("Even if one seller has achieved secondary meaning in a geographic term or has used the term arbitrarily, anyone who is in fact located in that place has a right to tell purchasers of his location.") Instead, the court will fashion a remedy similar to that approved by Justice Holmes in *American Waltham*, requiring defendant "to add words which will distinguish its products from the plaintiff's in the minds of the general public...." *Id.* Specifically, the court will order defendant Midwest Research of Michigan to add a disclaimer on the outside of all tapes it

---

**14.** The court emphasizes, however, that it believes this evidence proves likelihood of confusion.

**15.** For example, Mr. Stitz testified that S & B was involved in research as to how subliminal

tapes could help individuals deal with heart disease or cancer. Similarly, Mary Cook testified that MRI has done biofeedback work in areas such as pain reduction.

manufactures stating that Midwest Research of Michigan is in no way affiliated with Midwest Research Institute of Kansas City. Defendant must use the entire name Midwest Research of Michigan, Inc. and may no longer rely on "Midwest Research." In addition, the disclaimer should be added to the audio portion of defendants' tapes. The court notes that defendant Joe Land Company has already begun to put stickers with a similar disclaimer on the outside portion of its remaining inventory of S & B tapes. *See also Home Box Office v. Showtime/The Movie Channel,* 832 F.2d 1311, 1315 (2d Cir.1987) (Use of disclaimers is an "adequate remedy when they are sufficient to avoid substantially the risk of consumer confusion.").

The court understands that both S & B and Joe Land have an existing inventory of tapes and it would be commercially impracticable, *American Waltham,* 53 N.E. at 142, for defendants to dispose of all current inventory which does not contain the disclaimer. For these existing tapes only, a sticker may be used on the outside of the tape to note the necessary disclaimer and no audio disclaimer will be necessary. All future tapes manufactured by S & B, however, should have the disclaimer printed as part of the regular printing on the tape and should contain an audio disclaimer. Similarly, Joe Land must continue to use its disclaimer stickers and any tapes existing in Dr. Robin Tyre's inventory should be marked with the necessary disclaimer. Defendants will have two weeks from the date of this order to obtain the necessary disclaimer stickers.

## II. *Statutory and Common Law Unfair Competition Claims*

■ Section 43 of the Lanham Act, 15 U.S.C. § 1125(a) prohibits false designations of origin, as well as false descriptions and representations, from being placed on

any goods or services which enter commerce.[16] The purpose of section 43(a) is to provide "protection against outsiders who use the same geographical designation." *Black Hills Jewelry,* 633 F.2d at 750. In order to prove a violation of section 43(a) a plaintiff must show that the defendant's mark constitutes a false designation of origin and that the public is likely to be confused by the use. *WSM,* 724 F.2d at 1331. Plaintiff has not succeeded in proving either a statutory or common law unfair competition claim. Specifically, plaintiff failed to show that defendants' use of the term "Midwest Research" or "Midwest Research of Michigan" in any way falsely designates the origin of defendants' products. Indeed, as the court noted earlier, the source of the tapes is the midwest and, specifically, Michigan. In addition, the business is slowly moving into the research field. As a result, plaintiff's Counts II and III claims relating to unfair competition will be denied.

## III. *The Missouri Anti-Dilution Statute*

■ Count V of plaintiff's complaint alleges that defendants' use of the term "Midwest Research" violates the Missouri Anti-Dilution Statute, Mo. Ann. Stat. § 417.061. This statute provides

1. Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under sections 417.005 to 417.066, or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

The parties do not dispute the fact that plaintiff's service marks "Midwest Re-

---

**16.** Specifically, the statute provides
[a]ny person who shall fix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, of false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall call such goods or services to enter into commerce ...

shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.
15 U.S.C. § 1125(a).

search Institute" and "MRI" have been registered in Missouri as registration numbers S09668 and S09669, respectively. The mark Midwest Research Institute is also valid at common law since it has acquired secondary meaning and has "been in continual use and indicate[s] the origin of goods from a particular source." *Hallmark Cards*, 634 F.Supp. at 1000.

Thus, plaintiff's marks clearly come within the ambit of Missouri's Anti-Dilution Statute. Plaintiff has a remedy within that statute if it shows "that its mark is distinctive and that the defendants' use of a similar mark has created the likelihood of dilution." *WSM*, 734 F.2d at 1332 (citing *Pignons v. Polaroid Corp.*, 657 F.2d 482 (1st Cir.1981)). A mark may only be diluted if it is "arbitrary, coined, fanciful, or has become distinctive by acquiring a secondary meaning." Since plaintiff's mark has acquired a secondary meaning, as discussed above, relief is also appropriate under Missouri's Anti-Dilution Statute. For the reasons discussed in the section on common law trademark infringement, however, the court will not order total injunctive relief, but rather require that the disclaimers described above be added to defendants' goods.

### IV. *Defendants' Counterclaim*

 On December 15, 1987, defendants S & B Promotions and Midwest Research of Michigan, Inc. filed a counterclaim in this action asking the court to cancel plaintiff's registration[17] of the service mark "Midwest Research Institute." This court has the power to cancel a trademark registration pursuant to 15 U.S.C. § 1119. Counterclaim-plaintiffs urge the court to use this power and cancel plaintiff's mark on the basis that it is merely descriptive. Counterclaimants are correct in noting that a merely descriptive word is subject to cancellation. *WSM*, 724 F.2d at 1329. As noted above, however, the term "Midwest Research Institute" has achieved secondary meaning and, therefore, cannot be cancelled on the basis of being merely descrip-

tive. *See also Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 797 (5th Cir.1983) ("descriptive term lacking in secondary meaning" may be subject to cancellation). Because plaintiff's mark has achieved the requisite secondary meaning, the court declines to cancel MRI's registered service mark, "Midwest Research Institute." Accordingly, it is

ORDERED that plaintiff's motion for a preliminary and permanent injunction against defendants' use of the term Midwest Research of Michigan is denied in part. It is further

ORDERED that within two weeks of the date of this order all defendants must affix disclaimer stickers stating that Midwest Research of Michigan is in no way related to Midwest Research Institute in Kansas City, Missouri. It is further

ORDERED that all tapes manufactured in the future by defendants contain a statement, printed on the tape, that Midwest Research of Michigan is in no way related to Midwest Research Institute of Kansas City, Missouri. It is further

ORDERED that all tapes manufactured in the future by defendants contain an audio disclaimer at the beginning of the tape stating that Midwest Research of Michigan is in no way affiliated with Midwest Research Institute of Kansas City, Missouri. It is further

ORDERED that the counterclaim of defendants S & B and Midwest Research of Michigan for cancellation of trademark is denied. It is further

ORDERED that defendant Joe Land Company's motion for summary judgment is denied as moot. It is further

ORDERED that defendants' motion for joinder of parties is denied as moot.

---

17. This issue was not briefed by the parties but they stipulated that the court could decide the counterclaim on the basis of the evidence ad-
duced at the preliminary injunction hearings and the briefs submitted for those hearings.