**KING BEARINGS, INC., Plaintiff,**

v.

**KING BEARING, INC., and Bearings, Inc., Defendants.**

Civ. A. No. C 93–0352–L(A).

United States District Court,
W.D. Kentucky,
at Louisville.

Oct. 18, 1994.

James R. Higgins, Jr., Middleton & Reutlinger, Louisville, KY, for plaintiff.

Maureen P. Taylor, Brown, Todd & Heyburn, Louisville, KY, Robert V. Vickers, Body, Vickers & Daniels, Cleveland, OH, for defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALLEN, Senior District Judge.

Plaintiff, King Bearings, Inc., filed this suit in June, 1993 under 15 U.S.C. § 1051, *et seq.,* and state statutory and common law, seeking to enjoin defendants, King Bearing, Inc. [hereinafter "King Bearing"], and Bearings, Inc., from using the name "King" in conjunction with bearing products in Kentucky and Indiana. In September 1993 plaintiff amended its complaint seeking that the following states—Illinois, Wisconsin, Minnesota, North Carolina, Ohio, Virginia and West Virginia—be included within the injunction.

Defendants counterclaimed, asserting that if likelihood of confusion exists in Kentucky or Indiana, it is plaintiff who is creating the confusion by infringing on the service mark of the defendants. Defendants ask that plaintiff's state trademark registrations in Kentucky and Indiana be cancelled and that plaintiff be enjoined from using defendants' service mark in Chicago.

The Court commenced a preliminary injunction hearing in September 1993 and later consolidated it with the final injunction hearing, held in February, June and July of 1994. Subsequent to the hearing, the parties filed lengthy briefs, and the matter now stands submitted to the Court for decision.

Plaintiff incorporated in Kentucky on January 12, 1979. Its President, Ed King, a Louisville resident, did not invest any of his own funds in the new company. He began the venture using $196,000 furnished him by his in-laws, the Hancocks, who were the owners of a company known as Hancock Engineering Company. During the first six months of 1979, plaintiff carried on its business activities at the premises occupied by Hancock Engineering Company. Plaintiff's sales tax records indicate no taxable sales in the first three months of 1979, and one taxable sale in the second quarter of 1979.

It is undisputed that on March 27, 1979, plaintiff purchased inventory for $379 from an entity known as NTN. The goods were delivered in May 1979. In July 1979 plaintiff apparently sold the bearings supplied to it by NTN for roughly $600. In a published article, plaintiff stated that it would open its office for business on July 1, 1979. Despite the lack of any documented sales during the first quarter of 1979, plaintiff maintains that various C.O.D. transactions occurred during that period; however, plaintiff was unable to point to any particular purchase or sale made in such a fashion.

Defendant King Bearing incorporated in California in 1965. Originally, sales were confined to that state. However, the corporation grew rapidly; and by 1978, it had 872 employees and sales of at least $50,000,000. It expanded its business to include Arizona, Nevada, Utah, Washington and Oregon. During the 1980's it expanded into Texas, Louisiana, Arkansas and Tennessee. By 1986, its total sales were $200,000,000.

King Bearing advertised extensively and purchased bearings and other items from manufacturers located throughout the United States. Among these were SKF, Templer Bearings of Ohio, Procter & Gamble in Cincinnati, and Goodyear in Glasgow, Kentucky. Ed King testified that he knew nothing of defendant King Bearing although he had contacted twenty corporations engaged in the bearing business and had inquired about the existence of another King Bearing company. Although plaintiff produced some witnesses who likewise testified they had not heard of King Bearing, other witnesses produced by defendant testified that King Bearing was known to persons in the bearing business in Kentucky.

On April 9, 1979, a conversation took place between King Bearing's Chief Executive Officer, Ray Davilla, now deceased, and Ed King. At that time, King learned of the size of King Bearing. Subsequent to that conversation, another conversation took place between Ed King and Harry Oranges, the latter of whom was the founder of Valley Supply Company, which was acquired by King Bearing in 1977. Harry Oranges succeeded CEO Ray Davilla. The conversation between King and Oranges arose as a result of an invoice which had been sent in error to one of the two companies. Oranges told King there was no cause for concern as King

was in Kentucky and King Bearing was in California, and they did not pose a threat to each other.

King seeks to magnify the significance of that conversation by characterizing it as a promise that King Bearing would remain west of the Mississippi, and plaintiff could carry on its operations east of the Mississippi without interference from King Bearing. However, no written agreement exists from that conversation. As late as November 1992, Ed King wrote to Bearings, Inc., to complain of the use of the name King Bearing by Bearings, Inc.; he did not, however, mention any agreement between plaintiff and King Bearing as to territorial use of the service marks.

It should be noted that Oranges was involved in litigation with Bearings, Inc., and a judgment entered against him with respect to attorneys fees. It also is noteworthy that Oranges called Bearings, Inc., after he was asked by Ed King to testify in this case. Some sort of discussion took place regarding Oranges' situation in the Bearings/Oranges litigation although nothing of significance resulted from the discussion.

The Court finds that Oranges held a definite bias against the defendants; and for that reason, the Court declines to accord much weight to his testimony. Oranges himself stated that he considered plaintiff to be a "very small fly" in the picture. At best, the conversations among King, Davilla and Oranges reflect their awareness of where they were physically located and of where King Bearings had done business, including where plaintiff was commencing its business. Although King Bearing had contemplated acquiring Chicago Dodge, a Chicago-based bearing distributor; at the time of the King–Davilla–Oranges conversations, neither party envisioned acquisition of King Bearing by an Ohio manufacturer and the ensuing aggressive stance in Chicago.

The Court finds that in the spring of 1979, plaintiff and King Bearing became aware of each other's existence; that plaintiff knew of defendant's prior use of the service mark, King Bearing; that defendant was a large and viable corporation located on the west coast; and that King Bearing, acting through Oranges, acquiesced in the use by plaintiff of the name King Bearings in the Louisville area. The Court also finds that no discussions between Oranges or Davilla and Ed King concerning any possible expansion of plaintiff beyond the Louisville area; and that Oranges made no concession as to defendant King Bearing remaining on the west coast.

In *Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145 (5th Cir.1985), plaintiff owned the property rights in a fictional character known as CONAN THE BARBARIAN. It licensed others to use the name in various commercial and entertainment works. In 1970 it registered the title CONAN THE BARBARIAN for comic books. In the same year, defendants opened Conans Pizza, a restaurant, in Austin, Texas. Defendants promotional materials and menus featured a barbarian-looking male who resembled plaintiff's Conan character. While visiting relatives in Austin, plaintiff's owner stopped by the restaurant and wished the owner success. During its first four years of operation, defendant opened four additional Conan Pizza restaurants in the Austin area.

Approximately five years after the first Austin restaurant opened, plaintiff wrote to the defendant, objecting to the use of the Conan mark. Defendant then discontinued some of its use of the Conan Barbarian indicia. After defendant received plaintiff's letter in opposition, but prior to the filing of a law suit, defendant opened another new restaurant, this one in San Antonio, Texas. In 1982 defendant registered its service mark with the United States Patent and Trademark Office. Defendant's total sales had increased from $100,000 in 1976 to $3,000,000 in 1982.

The district court proceedings determined that plaintiff had waived its right to protect its mark in the Austin area. The plaintiff's acquiescence as to the Austin area, however, did not result in laches or acquiescence in the San Antonio area. As noted by the United States Court of Appeals for the Fifth Circuit, "[l]aches is ... inexcusable delay that results in prejudice to the defendant." 752 F.2d at 153. (citations omitted). Similarly, "acquies-

cence involves the plaintiff's implicit or explicit assurance to the defendant which induces reliance by the defendant." *Id.* (citations omitted).

We believe the facts in *Conan* bear some resemblance to those in the case at bar. During the years 1979 to 1990, plaintiff King Bearings gradually expanded its business to the point of generating approximately $1,000,000 in sales. Some of these sales were in states now claimed by plaintiff as its service mark territory. However, 90 percent of its sales took place in the Louisville, Kentucky, and southern Indiana areas; and in only one year since 1990 have plaintiff's sales in states outside of Kentucky amounted to as much as 10 percent of its total sales. *See* Plaintiff's Appendix.

The Court holds that King Bearing is not barred by acquiescence, laches or estoppel from contesting the right of plaintiff to use the name King Bearings, Inc., in areas other than metropolitan Louisville and southern Indiana. As to those two areas, the Court holds that defendant King Bearing acquiesced in plaintiff's acquiring a service mark.

In 1990 King Bearing was purchased by Bearings, Inc., a very large distributor of bearings under the names of Bruening Bearings, Inc., and Dixie Bearings. Bruening Bearings did business in Louisville and in Kentucky prior to plaintiff's existence. In 1991 Bearings, Inc., published its catalogue M, a massive publication with in excess of a 1,000 pages; and on each page appeared the names Dixie Bearings, Bruening Bearings and King Bearing. The publication was distributed to some 230,000 persons, and the cost of producing it was approximately $1,000,000. In 1991 King Bearing opened distribution branches in the Chicago suburban area, and in 1993 its sales were roughly $900,000. In 1993 King Bearing also open a store in Chicago, expending some $300,000 for its promotion.

For purposes of our analysis, we will refer to defendant King Bearing as the "senior user" and to plaintiff as the "junior user" of the mark. However, because of the geographic patterns of the two companies' operations, primacy in using the term, "king bearing," does not decide the question of which party, if either, has the exclusive right to use the mark.

Plaintiff contends that it is entitled to service mark protection in all of the states claimed in its amended complaint. It relies on two Supreme Court opinions, *United Drug Co. v. Theodore Rectanus,* 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918), and *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916), cases holding that a junior user of a mark may continue the use if it can establish that its first use of the mark was in good faith and was in a geographically remote area. In the instant case, it cannot be disputed that Kentucky is geographically remote from the west coast. Furthermore, although King Bearing may have purchased inventory from manufacturers in Kentucky, Ohio and throughout the nation, it was not selling any of these products in Kentucky.

With respect to good faith, defendant urges the Court to question plaintiff's good faith in adopting the name King Bearings. However, the Court is of the opinion that this issue is immaterial as we have found that King Bearing acquiesced in the use of the service mark by plaintiff in Louisville. To the extent the issue may be considered material, the Court is not convinced that Ed King decided to give his company his own surname "with some design inimical to the interests of" King Bearing. *Hanover Star Milling Co.,* 240 U.S. at 415, 36 S.Ct. at 361.

Defendants contend that King Bearing in California was nationally known at the time that plaintiff commenced its business. Although defendant was located on the west coast, as previously mentioned, it purchased many goods from manufacturers located throughout the United States. *Supra* at 3. The evidence is clear that defendant King Bearing had advertised in nationally distributed trade journals concerning its operations on the west coast. Many of the witnesses, including Mr. Browsky from NTN, a witness offered by the plaintiff, knew of the existence of King Bearing in California as early as 1978. However, no documentary proof exists showing the actual sales made by defendant

King Bearing in areas outside of California, Oregon, Nevada, Utah, Texas, Louisiana, Arkansas, and Tennessee until 1991. Plaintiff argues that defendant did not acquire a national service mark reputation or presence because it did not prove that it made any sales outside of the states in which it was operating.

*Safeway Stores, Inc. v. Safeway Discount Drugs,* 675 F.2d 1160 (11th Cir.1982), involved a clash between a Florida drug outlet, the defendant, and a large grocery chain with more than 2,400 stores, the plaintiff. Not one of plaintiff's many stores was located in Florida or in the southeastern portion of the United States. Although plaintiff had a large advertising budget, it did not advertise in the southeastern part of the United States. However, it had purchased farm and grove products from Florida sources for at least 30 years prior to the litigation and 20 years prior to the incorporation of Safeway Discount Drugs. The grocery chain bought $50,000,000 in products each year in the state of Florida and registered its name with the United States Patent and Trademark Office with the state of Florida as a service mark. The United States Court of Appeals for the Eleventh Circuit found that Safeway Stores had a substantial business presence in Florida, even if not in grocery retailing; that there was some evidence of actual confusion arising from Discount's use of the term, "Safeway"; and that this confusion entitled Safeway Stores to relief.

■ In the instant case, the evidence concerning King Bearing's business activities in metropolitan Louisville and southern Indiana is not as strong as that of the activities of Safeway Stores in the *Safeway* Eleventh Circuit opinion. It is true that defendant made purchases from two companies in Kentucky and from Procter & Gamble in Cincinnati. It also is true that defendant's advertising in national distributor publications probably came into the hands of various potential consumers of bearings.

Nonetheless, we must be guided by the rationale behind the grant of what is essentially a monopoly on a trade name. As stated by the Supreme Court in *Hanover Milling Co.,* trademark rights grow "out of use,

not mere adoption." 240 U.S. at 413, 36 S.Ct. at 360. A trademark user acquires rights in a geographical area only by actually using the mark, such that it acquires a secondary meaning. For this reason, a few sporadic purchases or sales do not grant common law trademark rights. While the question is close, this Court is of the opinion that King Bearing had neither a national service mark presence nor a Kentucky or Indiana service mark presence.

■ Because the Court holds that King Bearing did not establish a national service mark, we must address the issue of the parties' respective rights concerning areas outside Louisville, that is, cities in Kentucky such as Shelbyville, Shepherdsville, Elizabethtown and LaGrange as well as areas in southern Indiana located within 25 miles of Louisville.

The cases the Court finds of most assistance hold that a junior trademark holder may acquire priority over the senior trademark holder if it has shown significant market penetration before the senior trademark holder commences its market penetration. *Charles Jacquin Et Cie v. Destileria Serralles,* 921 F.2d 467 (3rd Cir.1990); *Natural Footwear Ltd. v. Hart, Schaffner & Marx,* 760 F.2d 1383 (3rd Cir.) *cert. denied,* 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257 (1985).

In *Charles Jacquin,* the Third Circuit Court of Appeals held that the market penetration of a trademark is determined by: (1) the volume of sales of the trademarked product; (2) the growth trends, both positive and negative, in the areas; (3) the number of persons actually purchasing the product in relation to the potential number of customers; and (4) the amount of product advertising in the area. The Court held that factor (3) should be determined by establishing the *total number of sales of the product by all* companies in competition. Although remand for further fact-finding was necessary, the Third Circuit indicated that plaintiff's apparent sales amounting to 5.38 percent of the total market in Virginia and 9.66 percent of the total market in West Virginia "may well support a finding of market penetration suffi-

cient to establish secondary meaning." 921 F.2d at 474.

Here, plaintiff offered no proof as to the number of persons purchasing the product in relation to the potential number of customers, and no proof as to any extensive advertising outside of the Louisville metropolitan area. Furthermore, the record includes no proof as to what is the total market in the states claimed by plaintiff. It is significant that the product (bearings) sold by the parties is not comparable to such small items as bottles used for the sale of cordials, and probably is not comparable to the items of clothing involved in the *Natural Footwear* case. 760 F.2d at 1386. We believe it is important to note that King Bearing sales in the Chicago area amounted to almost $667,-000 in two years and that its advertising for that same area and that same period amounted to $300,000.

Plaintiff's Exhibits Nos. 6 and 7 demonstrate that plaintiff has failed to make single year sales of as much as $70,000 in any state claimed by it. They also demonstrate that the majority of plaintiff's sales outside of Kentucky and Indiana were made to a firm, Bando America, located in Rock Island, Illinois. As the Court noted at trial, Rock Island is 180 miles from Chicago, and plaintiff made no showing that Rock Island is within the Chicago trade area.

Plaintiff contends that this case should be resolved by using the state boundary for defining the market. Although that approach has been used in cases where there is state control of the product, *see, e.g., Charles Jacquin*, 921 F.2d at 474, in the majority of cases, courts have used trade areas rather than state boundaries as appropriate for market penetration. *Natural Footwear*, 760 F.2d 1383, 1397 (3rd Cir.1985); *Wrist–Rocket Manufacturing Co. v. Saunders Archery Co.*, 578 F.2d 727 (8th Cir.1978); *ACCU Personnel, Inc. v. AccuStaff, Inc.*, 846 F.Supp. 1191, 1206 (D.Del.1994).

The Court holds that plaintiff has not established its right to an exclusive service mark in any of the states claimed by it, excluding metropolitan Louisville and cities in Kentucky, such as Shepherdsville, Shelbyville, Elizabethtown, and LaGrange, and cities in Indiana, such as New Albany, Jeffersonville, and Clarksville.

■ We now turn to the question of likelihood of confusion. King Bearing and its co-defendant have circulated the name King Bearing in Kentucky and Indiana and elsewhere by means of catalogue M, *supra* at 7–8. As plaintiff has not penetrated the market in a significant way in areas other than metropolitan Louisville and southern Indiana, the likelihood of confusion is of little importance except in those areas.

The United States Court of Appeals for the Sixth Circuit has adopted a test involving eight factors for determining likelihood of confusion: (1) strength of the mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) junior user's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *Frisch's Restaurants, Inc. v. Elby's Big Boy*, 670 F.2d 642, 648 (6th Cir.), *cert. denied*, 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982). *See also, Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts*, 944 F.2d 1235 (6th Cir.1991).

In the case at bar, the relatedness of the goods, the similarity of the marks, of the marketing channels used, and of the likelihood of expansion of product lines are obvious. With respect to the degree of care likely to be exercised by consumers, both companies build their business by selling their products to managers or purchasing agents of corporations, individuals who are a good deal more sophisticated in their approach to purchasing from two corporations with almost identical names than are consumers purchasing soft drinks or other common products sold to the general public. However, it is also true that even a sophisticated purchasing agent located in metropolitan Louisville or southern Indiana who looked at catalogue M and who knew of plaintiff's existence might believe plaintiff had been absorbed into the Bearings, Inc., corporate fold under the name, King Bearings.

As to the strength of plaintiff's mark, no proof was offered of any third parties using the King name in connection with the word "bearing" except for the parties in this action. A "strong" mark is one used in a "fictitious, arbitrary and fanciful manner," *National Lead Co. v. Wolfe*, 223 F.2d 195, 199 (9th Cir.1955), whereas a "weak" mark is a meaningful word in common usage, *Sunbeam Lighting Co. v. Sunbeam Corp.*, 183 F.2d 969, 972–73 (9th Cir.1950), or is merely suggestive or descriptive, *Majestic Mfg. Co. v. Majestic Electric Appliance Co., Inc.*, 172 F.2d 862 (6th Cir.1949). While plaintiff's mark is weak, it is entitled to protection due to the obvious similarity of the mark, to wit, identical names and products. *New West Corporation v. NYM Co. of Calif.*, 595 F.2d 1194, 1201 (9th Cir.1979).

To support the claim of actual confusion, Ed King offered his own hearsay testimony to the effect that he had received inquiries regarding whether his company had been purchased by Bearings, Inc. Evidence of some misdirected invoices also was introduced. The Court is of the opinion that the evidence of actual confusion is not strong. As held by the Sixth Circuit in *Homeowners Group v. Home Marketing Specialists*, 931 F.2d 1100, 1110 (6th Cir.1991), "where the parties have been doing business in the same area for some time and where they have advertised extensively, isolated instances of actual confusion are not conclusive or entitled to great weight in the determination." *See also, Sun Banks, Inc. v. Sun Fed. Savs. & Loan*, 651 F.2d 311, 319 (5th Cir.1981); *Amstar Corp. v. Domino's Pizza Inc.*, 615 F.2d 252, 260 (5th Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980).

With respect to intent in selecting the mark, the Court finds no intention on the part of King Bearing to palm off its products as those of King Bearings, Inc. In the Court's view, it would be irrational to believe that a corporation with the earning power of King Bearing would have any desire to imitate or use the term, King Bearings, Inc., to stimulate its own business.

In conclusion, sufficient evidence exists to warrant a finding of likelihood of confusion in metropolitan Louisville and southern Indiana. That confusion basically arises from defendants' use of catalogue M. In the future, any correspondence or other intercourse initiated by defendants with any actual or potential purchasers or suppliers in metropolitan Louisville or southern Indiana shall include the information that King Bearing is not the same corporation as King Bearings, Inc., and further, that King Bearing was formerly a California corporation which has been acquired by Bearings, Inc. This remedy is found in *Midwest Research Institute v. S & B Promotions*, 677 F.Supp. 1007 (W.D.Mo.1988), which holds that the "use of disclaimers is an 'adequate remedy when they are sufficient to avoid substantially the risk of consumer confusion'." *Id.* at 1016 (citing *Home Box Office v. Showtime/The Movie Channel*, 832 F.2d 1311, 1315 (2d Cir.1987)).

Defendants contend that King Bearing is entitled to the exclusive right to use the corporate name in Chicago and its suburbs. Inasmuch as King Bearing is the prior owner of the service mark and its proof has shown extensive advertising and very significant sales, a close question exists as to whether the contention should be sustained. However, if the Third Circuit test in *Charles Jacquin*, 921 F.2d at 474, is applied, the Court notes that defendants' witnesses testified that Chicago is a very large market, but they did not offer evidence as to the total volume of sales in that area or the total number of potential customers compared to the actual customers to whom defendants have sold bearings. Therefore, at this point in time, the Court believes it would not be appropriate to give defendants the exclusive right to use the service mark King Bearing in Chicago.

As to the registration of plaintiff's trademark in Kentucky, KRS 365.560 defines trademarks and service marks; and plaintiff apparently inadvertently applied for trademark registration rather than service mark registration. KRS 365.575(5) states, in essence, that a surname should not be registered unless it has become "distinctive of the applicant's goods or services" and has been used for "five years preceding the date of the filing of the application."

In addition, KRS 365.575(6) provides that a mark shall not be registered if it resembles a previously registered mark or a mark or trade name previously used in Kentucky by another, not abandoned, which will likely when applied to the goods or service of the applicants, cause confusion or mistake.

■ As we have held that King Bearing has acquiesced in the right of plaintiff to use its trademark in southern Indiana and metropolitan Louisville, we believe this acquiescence meets the requirement that the senior trademark has been abandoned. Therefore, despite the error in the registration application, we hold that the trademark registration in Kentucky is not void but should be amended to provide for a service mark registration.

Under Indiana law, a mark is not subject to registration if it is "primarily a surname." Ind.Code § 24–2–1–3(e)(3). Defendants contend that plaintiff has not shown the necessary distinctiveness to permit registration. The Court, however, does not believe defendants have established this fact. Therefore, we hold that defendants are not entitled to a cancellation of the registration in Indiana.

A judgment in accordance with this opinion will be entered this date. Each party will bear its own costs. Plaintiff failed as to its primary contention that it is entitled to exclusive service mark rights in metropolitan Louisville and southern Indiana as well as the other states listed in its amended complaint. Defendants, on the other hand, were unsuccessful in their counterclaim.

### *JUDGMENT*

This action having been tried before the Court and extensive briefs having been filed, and the Court having filed its findings of fact, conclusions of law and memorandum opinion, after due consideration with the Court fully advised,

**IT IS ORDERED AND ADJUDGED** that defendants shall issue disclaimers notifying any customers or potential customers or suppliers to whom they send literature in metropolitan Louisville and southern Indiana that King Bearing, Inc., is not affiliated with plaintiff, and further, is a California corporation acquired by Bearings, Inc. One disclaimer per customer or potential customer shall be regarded as sufficient under this judgment.

**IT IS FURTHER ORDERED AND ADJUDGED** that plaintiff's complaint as amended be, and hereby is, dismissed as it seeks the right to exclusive service marks in the states of Illinois, Ohio, Minnesota, North Carolina, Virginia, Pennsylvania, and Tennessee.

**IT IS FURTHER ORDERED AND ADJUDGED** that defendants' counterclaim be, and hereby is, dismissed.

**IT IS FURTHER ORDERED AND ADJUDGED** that each party shall bear its own costs.

This is a final and appealable judgment, and there is no just cause for delay.