Gerald E. CUSHMAN and Amanda M. Cushman, his wife, Mutton Hollow Enterprises, Inc., Plaintiffs–Appellants,

v.

MUTTON HOLLOW LAND DEVELOPMENT, INC., Mutton Hollow R.V. Resort Association, and Steven S. Redford, Defendants–Respondents.

No. 16034.

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 5, 1990.

John E. Price and Joseph D. Sheppard, III, Woolsey, Fisher, Whiteaker & McDonald, Springfield, for plaintiffs-appellants.

Elmer J. Meyer and Gene Wayne Redding, Elmer J. Meyer & Associates, Branson, for defendants-respondents.

MAUS, Judge.

For seventeen years the plaintiffs, Gerald E. Cushman and Amanda M. Cushman, his wife, used the name "Mutton Hollow" in the operation of a "theme park" on Highway 76 west of Branson. In early 1988, defendant Steven S. Redford incorporated defendant "Mutton Hollow Land Development, Inc.", and defendant "Mutton Hollow Property Owners' Association, Inc." Defendants propose using those corporate names in the development and operation of a recreational vehicle resort and a campground on property adjoining the property of the plaintiffs. By their petition, the plaintiffs prayed that the defendants be enjoined from using the name "Mutton Hollow" and for damages. The trial court denied relief. On appeal, the plaintiffs ask this court to enter such an injunction and remand the case to permit proof and recovery of damages.

The parties acknowledge it is the duty of this court to review the case under Rule 73.01 and the familiar standards of *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). The defendants rely upon the proposition there is substantial evidence to support the judgment and it must be affirmed. The plaintiffs' attack is based upon the proposition that critical findings of the trial court are not supported by the evidence or are against the weight of the evidence and erroneously declare the law. The plaintiffs

conclude that the judgment is against the weight of the evidence and erroneously applies the law and must be reversed.

The above standard of review includes the following criteria.

"All fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached." Rule 73.01(a)(2).

"Due regard shall be given to the opportunity of the trial court to have judged the credibility of witnesses." Rule 73.-01(c)(2).

However, those precepts do not permit this court to affirm the judgment by merely disregarding all evidence supporting the plaintiffs' position. An express or an implied finding on an issue cannot stand when it is not supported by the evidence or is against the weight of the evidence. Further, the above-stated rule concerning deference is subject to limitations that have been expressed in the following terms.

"Moreover, where the facts are derived from the pleadings, stipulations, exhibits, and depositions ..., or where the evidence is not controverted and 'the case is virtually one of admitted facts,' ... or where the evidence is not in conflict, ..., no deference is due the trial court's judgment." *Southgate Bank and Trust Co. v. May*, 696 S.W.2d 515, 519 (Mo.App. 1985) (citations omitted).

"[A]lthough we defer to the findings of the trial court where the matter of credibility of witnesses is involved, we need not do so where a disputed question is not a matter of direct contradiction by different witnesses." *Johnson v. Roberts*, 532 S.W.2d 530, 532 (Mo.App.1976).

Also see *Bollinger v. Sigman*, 520 S.W.2d 710 (Mo.App.1975); *G___ M___ H___ v. J___ L___ H___*, 700 S.W.2d 506 (Mo. App.1985); *Slentz v. Cherokee Enterprises, Inc.*, 529 S.W.2d 495 (Mo.App.1975).

In this connection, it is appropriate to note the record includes much hearsay evidence contained in exhibits such as newspaper articles and advertisements. These exhibits were admitted without objection or limitation.

"However, the letter was admitted into evidence with 'No objection' to any part of it. It was not offered for any limited purpose but was admitted generally. Under these circumstances its contents may properly be considered as evidence of the facts therein set forth." *Denton Construction Co. v. Missouri State Highway Com'n*, 454 S.W.2d 44, 48 (Mo. 1970).

"Hearsay evidence, if not objected to, is admissible and may be considered, along with other evidence, in determining whether a submissible case has been made. ... The probative worth and value of such evidence is for the trier of the facts." *G___ M___ H___ v. J___ L___ H___*, supra, at 512 (citation omitted.)

Also see *Bussmann Mfg. Co. v. Industrial Com'n of Missouri*, 327 S.W.2d 487 (Mo. App.1959); Anno: Hearsay—Admission Without Objection, 79 A.L.R.2d 890 (1961).

Viewing the evidence under the foregoing principles, the following is a basic outline of the facts pertinent to the dispositive issues. Additional evidence will be noted where relevant to the opinion.

Approximately eighty years ago, Harold Bell Wright wrote the novel "The Shepherd of the Hills". This well-known book is based upon people living in the Ozark hills west of Branson. The setting involves several locations or sites such as Old Matt's Cabin, Inspiration Point, Dewey Bald, Compton Ridge, Sammy Lane's Lookout, and Mutton Hollow. The book, in extolling its beauty, describes in general terms the location of Mutton Hollow. The nature of the description can best be characterized by questions to and answers given by James Thurman. Mr. Thurman was the director of the Shepherd of the Hills Outdoor Theatre. He had worked at that establishment for twenty years and studied the book. Thurman was called as a witness by the defendants.

"Q Are you familiar with a reference in that book to a place called Mutton Hollow?

A Yes, sir, I believe so.

Q  Does the book actually describe Mutton Hollow?

A  Yes, it does.  It's definitely to your own interpretation, but, yeah, I would say so, to a degree."

The name "Mutton Hollow" also appears on a U.S. Geological Survey Topographic Map prepared in 1956 and revised in 1981. This map shows the contours of the area where the name appears, but does not otherwise define the boundaries of Mutton Hollow.

Since 1948 the Cushman family has owned a tract of approximately 530 acres, the northeast boundary of which is Highway 76.  It is located on the southwest side of Highway 76 between the junctions of that highway and Highways 165 and 265. The tract includes a portion of the area that is within the general description of Mutton Hollow.

Plaintiffs Gerald E. Cushman and Amanda M. Cushman, his wife, acquired the tract in 1965.  Starting in 1970, the Cushmans developed the tract as a "theme park". That development was appropriately described in the White River Electric Co-op News published in Branson, Missouri in September 1973.

"Harold Bell Wrights [sic] famous novel, The Shepherd of the Hills, was written and had its actual setting in an area just west of Branson.  This area is well known as the Shepherd of the Hills Country.  Many visitors come to see such historic sites as Old Matts Cabin, Inspiration Point (where the story was written) Notch Post Office, and many others.

Until three years ago the area known as Mutton Hollow, the place where the Shepherd's Cabin was located, was undeveloped.  It could be seen from Highway 76 which winds high above the hollow.

In 1970, Gerald and Margaret Cushman who own 530 acres including Mutton Hollow, built a rustic little community of attractive shops and other buildings at the east end of Mutton Hollow.  The shops are occupied by various tradesmen and businesses."

In 1984, the Cushmans, in a joint venture with Norman Wright (son of Harold Bell Wright), built a museum on the tract to house the original manuscript of "The Shepherd of the Hills" and other Harold Bell Wright memorabilia.  At the time of the trial, the development on the tract included a stable and trail rides, the Harold Bell Wright Museum, a restaurant, a theatre, and sixteen or seventeen stores.  The Cushmans incorporated "Mutton Hollow Enterprises, Inc." to lease certain facilities. They incorporated "Mutton Hollow Retail, Inc." to operate retail stores.  Amanda Cushman runs "Amanda's" which features native crafts, including baskets, woven rugs, handmade dolls, china painting, primitives, sun bonnets, handmade candles, lye soap and handmade quilts.  The Cushmans also operate "Old Shepherd's Campground" at the north end of Mutton Hollow.  The Old Shepherd lived in Mutton Hollow.

The plaintiffs extensively advertised their development.  There is evidence of such advertisement by signs, brochures, and in various publications.  In addition, the lessees of leased facilities have advertised their businesses as located in Mutton Hollow.  The development has received publicity in various publications and on television.

Initially, the sign maintained at the entrance to the development read "Mutton Hollow".  Subsequently, at a time not established by the evidence, that sign was reconstructed and enlarged to appear as shown below.

The words "Mutton Hollow" are in white. The balance of the lettering is in yellow.

In a similar vein, early advertisements referred only to "Mutton Hollow". Later, advertisements for the development continued to use the designation "Mutton Hollow" but often included in smaller and different style letters the words "Craft Village".

Examples of advertising by the plaintiffs include the following. A one-half page statement in the June 1973 Ozark's Mountaineer. This advertisement shows steaks being cooked over an open fire. It is headed "Mutton Hollow in the Shepherd of the Hills Country." The balance of the ad describes a steak dinner, the trail ride and various crafts in the development. It announces "Mutton Hollow is five miles west of Branson, Mo, via Hwy. 76". A subsequent page in that publication has a smaller ad for "Amanda's" at "Mutton Hollow, W. Hwy. 76, Branson, Mo."

There was a quarter-page ad in the October 2, 1983 edition of Travel Host. This ad is headed "Mutton Hollow". It lists the various shops in the development and gives its location.

The plaintiffs distributed a single sheet "flyer" headed "Experience Historic Mutton Hollow". The flyer then lists ten shops located in the development and at the bottom publicizes "Sammy's Cabin" for "Fine Food and Atmosphere, Tucked Away in Beautiful Mutton Hollow."

From 1979 to 1987, the plaintiffs had spent $200,715.34 advertising their development. The advertising budget for 1988 was $43,000.00.

Examples of the publicity received by the development include the following. The October 10–11, 1970 edition of The Whiteriver Leader has a front-page article headed "Cushmans Revive Historic Mutton Hollow Location." The article then describes the plaintiffs' development.

The August 9, 1973 edition of the Newton County News of Granby, Missouri contains a column on the front page headed "Cushmans Developed Mutton Hollow." The article gives the history of Gerald Cushman of Neosho and Amanda Bush Cushman of Ritchey developing Mutton Hollow.

The June 12, 1980 edition of an unidentified newspaper contains an article headed "Pro–Rodeo season opens at Mutton Hollow." The article identifies the site of the opening performance of the Heart of America Championship Rodeo to be the Cushmans' development at Mutton Hollow.

A feature article on the front page of the May 24, 1982 edition of the Beacon and Leader of Branson, Missouri is headed "Peaceful, historic Mutton Hollow growing into major attraction." The article then relates the history of the development of Mutton Hollow and the Cushman family. It describes the various attractions in the development, including the following statement. "The shops feature crafts that include candymaking, pottery, woodcarving, broom making, and they also sell antiques."

The April 1983 edition of a twelve-page newspaper insert concerning "Plumb Nelly Days" announces that this celebration would be held in downtown Branson, Harbor Town Mall and Mutton Hollow. The publication includes a schedule of events and the location at which each event will be held. For each of the three days there is a location column headed "Mutton Hollow." This publication also includes advertisements for Sammy's Cabin at Mutton Hollow, Dory's Candles in Mutton Hollow and an advertisement for the activities of Plumb Nelly Days scheduled at "Mutton Hollow, ½ mile W. of Whitewater."

The front page of an "Extra" to the Springfield News & Leader of May 2, 1984, features an article concerning the museum. A heading announces "Museum in Mutton Hollow shows glimpse into Harold Bell Wright's life in Ozarks." The article then relates how Norman Wright participated in the establishment of the museum in the development owned by the plaintiffs.

The exhibits include an attractive booklet entitled "Ozark Mountain Country." The booklet contains colored photographs of various tourist attractions in the Ozarks and a brief description of each attraction. The booklet includes Lake Taneycomo, Table Rock Lake, Springfield, Exotic Animal

Paradise, various country stores, Uncle Ike's post office at Notch, Missouri, Hollister, Silver Dollar City, Shepherd of the Hills Theatre, Wilderness Settlement, the School of the Ozarks, and Whitewater. The cost of the publication is shown to be $3.95. The publication devotes two pages to the plaintiffs' development. One page announces "Ozark Mountain Country is Mutton Hollow." Two pages are devoted to pictures of the Cushman development, including the Woodshed, Mutton Hollow Picture Gallery, the Livery Stable, Sammy's Cabin, The Mutton Hollow Mountaineer, and Amanda's.

The plaintiffs testified their development had been successful. Their patronage had increased each year. The estimated attendance in 1987 was 300,000–400,000 visitors.

The plaintiffs presented direct evidence of public recognition of their development. Clay Anderson lived in the Branson area for twenty-three years. His testimony included the following question and answer:

"Q Well, if a tourist asks you 'how do I get to Mutton Hollow?'

A I would send—I would first think they were asking for the commercial enterprises that are in the—that the Cushmans have, yes—".

As stated, the defendants presented James Thurman as a witness. His testimony included the following question and answer:

"Q If a tourist comes up to you and asks you to go—that they need to know how to get to Mutton Hollow, do you send them out into the valley, or do you send them to the Cushman's business?

A Well, naturally I send them to the business, where the big sign that says 'Mutton Hollow'."

Robert B. Smith, III, had lived in the Branson area for nine years. He was the publisher of three newspapers, including The Branson Beacon. He was also the president of the Branson Chamber of Commerce. His testimony included the following question and answer:

"Q Okay. In the eyes of the tourists— well, strike that. If someone asked you how to get to Mutton Hollow, where do you send them?

A Send them to Mutton Hollow. I'm being flippant; it's out Highway West 76 to the big sign, and you hang a left, and you're in Mutton Hollow."

Defendant Steven S. Redford had been in the business of developing resort property for seventeen years in the Taney County area. He had done business under the following names: Redford Investments, Inc., Treasure Lake R.V. Resort, Treasure Resorts, Inc., Point Royale Village and Country Club, Inc., Castleview Estates, Kimberling Inn Resort and Vacation Club, Emery Creek Homestead, Eaton Farm and Schooner Bay Landing.

In the fall of 1987, Redford bought 520 acres adjoining the plaintiffs' property on the south. That property had been known as the "Fall Creek Ranch." The tract includes a portion of Mutton Hollow as described in the book. Defendants propose to develop the property for R.V. lots, cabin lots, accommodations, and a campground. The development would include a lake and a swimming pool. A surveyor had developed plans for Phase I of the resort. The surveyor testified that neither the R.V. resort nor the lake would be in the area he regarded as Mutton Hollow. Initially, Redford planned to develop the property under the name "Twin Lakes."

There was no access from the Redford tract to Highway 76. Soon after he bought the property, Redford attempted to acquire an easement from the plaintiffs. His negotiations to do so were unsuccessful. Redford then filed a lawsuit against the plaintiffs to establish an easement for such an access. The record does not reflect the basis for that suit nor its status. After the negotiations for the acquisition of the easement terminated, Redford determined to develop and advertise the property under the names "Mutton Hollow Land Development, Inc." and "Mutton Hollow R.V. Resort Association." When the plaintiffs learned of the names under which Redford proposed to conduct business, this action was filed.

The trial court made twenty-three findings of fact. These findings were followed by "NOW, THEREFORE" it is adjudged that relief be denied. Rule 73.01(a)(2) contemplates the trial court shall file "a statement of the grounds for its decision." The judgment in question gives no clue concerning which of those findings or what legal proposition or propositions resulted in that denial. This court considers each of those findings. However, a recitation and separate discussion of each of those twenty-three findings would unduly lengthen an already long opinion. Many of those findings are overlapping and duplicitous. The following are representative findings that are fundamental to the judgment of the trial court and to the review of this case.

"2. Since the publication of the novel, 'The Shepard [sic] of the Hills', the name 'Mutton Hollow' has been adopted to describe a specific geographical area;

3. The Mutton Hollow is owned by both the Plaintiffs and the Defendants;

\*       \*       \*       \*       \*       \*

5. Plaintiffs have been operating a craft village in the Mutton Hollow under the trade name 'Mutton Hollow Craft Village' for the past seventeen years;

\*       \*       \*       \*       \*       \*

7. No other business or other enterprise or organization has used the trade name 'Mutton Hollow Craft Village', but other businesses in Mutton Hollow have used the term 'Mutton Hollow' in their business and trade names;

\*       \*       \*       \*       \*       \*

. 10. The name 'Mutton Hollow Craft Village' has, over the last seventeen years become associated with Plaintiff's Craft Village business to the exclusion of all other businesses;

\*       \*       \*       \*       \*       \*

12. The Defendants intend to use the name Mutton Hollow R.V. Resort in development of a recreational vehicle resort catering to tourists and others, all of whom will be purchasing lots for recreational vehicles;

13. The Defendants' business is not now, nor does it appear likely to become, in competition with Plaintiffs' craft village operation;

\*       \*       \*       \*       \*       \*

15. The Defendants' business operation will not confuse the public respecting the services and/or commodities offered by the Plaintiffs;

\*       \*       \*       \*       \*       \*

18. Some of the consuming public have interpreted the term Mutton Hollow Craft Village as referring to the Plaintiffs' business operations;

\*       \*       \*       \*       \*       \*

20. The goodwill of the Defendants' other businesses is irrelevant to the operation of the Defendants' land development in the 'Mutton Hollow';

\*       \*       \*       \*       \*       \*

22. Should the Defendants venture to conduct the same or similar business as the Plaintiffs, the Plaintiffs would have adequate remedies available to enjoin the Defendants and sue for unfair competition."

The implied finding of the trial court is that the plaintiffs did not adopt "Mutton Hollow" as a trade name. This was the defendants' contention in the trial court and it is their contention upon appeal. The defendants contend the trade name adopted and publicized by the plaintiffs is "Mutton Hollow Craft Village." The defendants' contention is reflected in Finding "5" of the trial court. The defendants argue that the use of the words "Mutton Hollow" in combination with "Land Development, Inc." and "R.V. Resort Association" does not constitute infringement upon the trade name "Mutton Hollow Craft Village."

It is not necessary to consider the validity of this contention. Finding "5" is against the weight of the evidence. The trade name adopted by the plaintiffs is best demonstrated by the signs at the entrance to their commercial development. As noted, the sign initially stated "Mutton Hollow." By the reconstructed sign, the Cushmans obviously continued the use of the trade name "Mutton Hollow" for the commercial development at the site. The addi-

tional lettering on the principal sign and the subsidiary signs announce there is a craft village at the site, as well as Sammy's Cabin restaurant and trail rides. The same is true of the gist of the advertisements in evidence using the term "Craft Village." The Cushmans' adoption of the trade name "Mutton Hollow" has been consistently recognized by the media in according publicity to the Cushmans' commercial development. A typical example is the booklet mentioned above which announces "Ozark Mountain Country is Mutton Hollow." As demonstrated by the two pages of pictures, the "Mutton Hollow" referred to is the Cushmans' commercial development. Also, as hereafter more fully developed, plaintiffs' adoption of the trade name "Mutton Hollow" has been recognized by representatives of the defendants. This court determines the plaintiffs adopted and have been operating the commercial development in question since 1970 under the trade name "Mutton Hollow."

Along the same lines, Finding "7" is misleading. There was evidence the name "Mutton Hollow" has been used by the plaintiffs for the location of their commercial development and for the location of the craft village. There was also evidence that the name "Mutton Hollow" has been used by lessees of the plaintiffs with respect to their business location in the Cushmans' commercial development. However, the undisputed evidence is that no businesses outside the Cushman commercial development have used the trade name "Mutton Hollow." This court so finds.

Findings "10" and "18" are misleading. It is true that over the last seventeen years the name "Mutton Hollow Craft Village" has become associated with the plaintiffs' craft village. It is likewise true that some of the public have interpreted the term "Mutton Hollow Craft Village" as referring to the plaintiffs' business operations. However, those findings do not mitigate against the fact that "Mutton Hollow" has acquired a secondary meaning as the commercial development of the Cushmans, including a craft village.

By Findings "2" and "3", the trial court determined the name "Mutton Hollow" had been adopted to describe a geographical area and which area is owned by both the plaintiffs and defendants. These findings are supported by the evidence. Therefore, the defendant argues "that because the name 'Mutton Hollow' is descriptive of a geographical place, the law is clear that it cannot be exclusively appropriated and that Plaintiffs can only complain when it is used by another in such a manner as to falsely convey its secondary meaning." The validity of this argument must be measured by the application of the principles of the law of unfair competition.

The difficulty of that task is underscored by the elusive nature of the concept of unfair competition. That concept has been stated in the following terms.

"'Unfair competition is a species of commercial hitch-hiking which the law finds offensive, and, therefore, prohibits. The law of unfair competition is but a reaffirmation of the rule of fair play. It aims to effect honesty among competitors by outlawing all attempts to trade on another's reputation—it gives the crop to the sower and not to the trespasser. In so doing it strives to protect the buying public from deception. ...'" *Shrout v. Tines,* 260 S.W.2d 782, 788 (Mo.App.1953) (citations omitted).

A treatise on the subject contains an appropriate observation.

"Unfair competition is not an objective 'thing' and has no objective reality. It is merely an intellectual concept convenient to describe a process which goes on in courts of law. It is as specious to attempt a sweeping, all-inclusive definition of 'unfair competition' as to try to define the legal term 'reasonable.' The term 'unfair competition,' as used to describe a generic class of commercial activities, is too abstract and subjective when divorced from concrete examples. One reason why the author has not attempted an over-all, sweeping definition is that the meaning of the term is fluid, having been refined on a case-by-case basis by lawyers and judges."

1 J. McCarthy, Trademarks & Unfair Competition § 1:3 (2d ed. 1984) (footnotes omitted).

■ There are general principles running through the cases. However, "[i]n determining whether or not unfair competition exists each case must be judged on its own particular facts." *Better Business Bureau, Etc. v. Chappell,* 307 S.W.2d 510, 516 (Mo.App.1957). Also see *Cunetto House of Pasta v. Tuma,* 689 S.W.2d 690 (Mo.App.1985); *Thomas Patrick, Inc. v. KWK Inv. Co.,* 357 Mo. 100, 206 S.W.2d 359 (1947).

This case presents an issue of the use of a "trade name." The term "trade name" is broader than the term "trademark."

"A trade-mark is generally described as a sign, device or mark by which the articles produced or dealt in by a particular person or organization are distinguished or distinguishable from those produced or dealt in by others, and must be affixed to the goods or articles; while a trade-name is descriptive of the manufacturer or dealer himself as much as his own name is, and frequently includes the name of the place where the business is located; it involves the individuality of the maker or dealer for protection in trade, and to avoid confusion in business, and to secure the advantages of a good reputation; it is more popularly applied to the good will of a business, and need not be affixed to the goods sold. In other words, it is not regarded as a trade-mark in the strict technical sense." *Katz Drug Co. v. Katz,* 240 Mo.App. 739, 217 S.W.2d 286, 289 (1949) (emphasis in original).

Nevertheless, the terms are often used interchangeably and their existence is governed by substantially similar principles. *Cornucopia, Inc. v. Wagman,* 710 S.W.2d 882 (Mo.App.1986); *Midwest Research Institute v. S & B Promotions, Inc.,* 677 F.Supp. 1007 (W.D.Mo.1988).

The common law definition of a trade name is now embodied in a statute. " '**Trade name**', a word, name, symbol, device or any combination thereof used by a person to identify his business, vocation or occupation and distinguish it from the business, vocation or occupation of others...." § 417.005(7). Cf. *Katz Drug Co. v. Katz,* supra.

■ It is the general rule "that words merely descriptive, geographic or generic are common property and generally cannot be exclusively appropriated as a trade-name...." *Missouri Fed. of Blind v. National Fed. of Blind, Etc.,* 505 S.W.2d 1, 7 (Mo.App.1973). The reason that general rule includes geographic words, has been succinctly explained.

" 'Geographical and place names may be used by all persons for the purpose of truthfully stating the origin of materials used or the location of a business, and, if the terms are used in such a manner that no actual or probable confusion or deception results, no one can complain, but use in such a manner as to cause unnecessary confusion constitutes unfair competition and will be enjoined.' " *Pan American Realty Corp. v. Forest Park Manor, Inc.,* 431 S.W.2d 144, 149 (Mo. 1968) (emphasis added).

However, the general rule denying protection to the use of geographic names as a trade name is subject to exceptions. The basic exception has been expressed in the following terms:

"[S]uch words may ' "nevertheless be protected against simulation when they have acquired a secondary meaning, differing from their primary meaning, that is, when they have become associated in the mind of the public as identifying the source or origin of goods, [services] themselves." ' *Shrout v. Tines, supra,* l.c. 260 S.W.2d [782] at 788[4]; *Better Business Bureau, Etc. v. Chappell, supra,* l.c. 307 S.W.2d at 515[3–5]." *Missouri Fed. of Blind v. National Fed. of Blind, Etc.,* supra, at 7.

Examples of geographic names that have acquired a secondary meaning include the following.

Elgin, Illinois as used in Elgin watches. *Elgin National Watch Co. v. Illinois Watch Case Co.,* 179 U.S. 665, 21 S.Ct. 270, 45 L.Ed. 365 (1901).

Waltham, Connecticut as used in Waltham watches. *American Waltham Watch Co. v. United States Watch Co.*, 173 Mass. 85, 53 N.E. 141 (1899).

Nantucket, Massachusetts as used in Nantucket shirts. *In re Nantucket, Inc.*, 677 F.2d 95 (C.C.P.A.1982).

Cape Girardeau, Missouri as used in Cape Coal Company. *Shrout v. Tines*, supra.

This exception to the limitation upon the right to adopt a geographic name as a trade name is much like the exception to the right to use one's own name in a trade name. "The right to operate under one's own name is not unlimited.... When a family name acquires a secondary [meaning], as it has in the instant case, the first user is entitled to protection." *Cunetto House of Pasta v. Tuma*, supra, at 692 (citation omitted). Also see *Osborn Paper Co. v. Carrold Osborn Paper Co.*, 361 Mo. 357, 234 S.W.2d 614 (1950); *Katz Drug Co. v. Katz*, supra.

The following observation is also relevant. "The Lanham Act eased the restrictions upon the registration of geographically descriptive marks. Thus, the present statute precludes registration of marks on the Principal Register that are 'primarily geographically descriptive'. 15 U.S.C. § 1052(e)(2). Section 1052(f) permits registration of geographical marks 'which [have] become distinctive of the applicant's goods in commerce'. *Prima facie* proof of such distinctiveness is shown by 'substantially exclusive and continuous use' of the mark for five years." *Saratoga Vichy Spring Co., Inc. v. Lehman*, 491 F.Supp. 141, 149 (N.D.N.Y.1979) (emphasis in original).

Decisions under that Act are appropriately considered in determining whether or not the name "Mutton Hollow" is "primarily geographically descriptive" or a true geographic name. It is significant that decisions under that Act more readily permit the adoption of a trade name when the actual geographic place referred to is obscure to the public. It has been held that to bar the adoption of a geographic term as a trade name, it is necessary that the public

perceive the mark as an *actual place name* "and this is where the question of obscurity or remoteness comes to the fore." *In re Societe Generale Des Eaux Minerales De Vittel*, 824 F.2d 957, 959 (Fed.Cir.1987).

Under the Lanham Act, it has been held that the geographic name "Nantucket" can be adopted as a trade name for men's shirts, even though it is the name of an island. In re Nantucket, Inc., supra. As a second example, it has been held that the geographic name "Jever" can be adopted as the trade name for a beer, even though that is the name of a town in northwest Germany. In so holding, the board found that the town of Jever was relatively obscure as an actual geographic term. *In re Bavaria St. Pauli Brauerie AG*, 222 USPQ 926 (TTAB 1984).

■ Whether or not the term "Mutton Hollow" has acquired a secondary meaning as a trade name for the plaintiffs' commercial development, is determined by public recognition. "[T]he word 'Waltham,' which originally was used by the plaintiff in a merely geographical sense, now, by long use in connection with the plaintiff's watches, has come to have a secondary meaning as a designation of the watches which the public has become accustomed to associate with the name." *American Waltham Watch Co. v. United States Watch Co.*, supra, 53 N.E. at 142. Also see *A.J. Canfield Co. v. Honickman*, 808 F.2d 291 (3rd Cir.1986).

■ That determination of the existence of a secondary meaning must be based upon relevant factors demonstrating public recognition. "Generally, the factors relevant to the issue of secondary meaning include: the amount and manner of advertising, volume of sales, the length and manner of the mark's use, direct consumer testimony and consumer surveys." *Saratoga Vichy Spring Co., Inc. v. Lehman*, supra, at 150. "A stronger showing of secondary meaning is made by a showing that there exists evidence which is probative of the success of the efforts to popularize a mark." *Id.* at 151. "Such factors as actual user of a trade name, length of time, advertising and sales volume go into

the creation or development of a secondary meaning." *Shrout v. Tines,* supra, at 788. "The apparent success of plaintiff's operation as Missouri Federation of the Blind during the decade of its independent status is sufficient proof that plaintiff's tradename had become identified with its services in the public mind and had acquired a secondary meaning to which plaintiff has the exclusive right." *Missouri Fed. of Blind v. National Fed. of Blind, Etc.,* supra, at 7.

■ The evidence relative to whether or not the term "Mutton Hollow" has acquired a secondary meaning referring to the plaintiffs' commercial development has been noted. It may be summarized as follows. The plaintiffs persistently advertised their commercial development as "Mutton Hollow" for seventeen years. From 1979 to 1987, the plaintiffs spent $200,715.34 for such advertising. The media consistently referred to that development, including the craft village, trail rides, the Harold Bell Wright Museum, Sammy's Cabin restaurant, as being in and constituting Mutton Hollow. All of the members of the public who testified on the subject acknowledged the term "Mutton Hollow" to refer to the plaintiffs' commercial development. There is no evidence to the contrary.

That recognition has also been acknowledged by persons employed by the defendants. Counsel for the defendants, in asserting a complaint based on an alleged discharge of sewage from the plaintiffs' development referred to the "sewage treatment facility located at Mutton Hollow" and asked "whether or not Mutton Hollow had been given a variance with respect to the amount of discharge of sewage...." A notice for a zoning hearing concerning the defendants' property, prepared on behalf of the defendants, read as follows:

"Taney County Planning Commission will conduct a public hearing on the application of Steve Redford to develop 419 acres in Sec. 3 at T22N R22W and Sec. 34 at T23N R22W. The proposed area is located between Highways 76 and 265 behind Mutton Hollow. Public comment

on this proposed development will be accepted at the hearing to be held Monday, March 14, 1988, at 7:30 P.M. in the Division I Courtroom of the Taney County Courthouse, Forsyth. A copy of the application will be available for review on or after March 7, 1988."

(emphasis added).

The patronage of 300,000–400,000 persons at the plaintiffs' commercial development in 1987 lends great strength to the plaintiffs' successful adoption of that trade name.

" 'Regardless of whether a word or words adopted and used as a trademark or trade name could be characterized as geographical in nature, where such words have acquired a "secondary meaning," the courts will afford equitable protection to the party whose use of the word has created secondary meaning.... It deserves protection when, because of association with a particular product or firm over a period of time, the word has in the mind of the public come to stand as a name or identification for that product or firm....' " *Bank of Texas v. Commerce Southwest, Inc.,* 741 F.2d 785, 787 (5th Cir.1984) (citation omitted in original).

In summary, the overwhelming weight of the evidence is that the term "Mutton Hollow" has acquired a secondary meaning as a trade name for the plaintiffs' commercial development. This court so finds.

Nevertheless, under some earlier authorities at common law, the acquisition of such a secondary meaning was not per se sufficient to bar the use of a generic or geographic term in a similar trade name by a second user. It had been stated that the second user must be in competition with the first user and

"a plaintiff's trade name is entitled to protection against a subsequent user of the name if the designation complained of is so similar to the plaintiff's trade name that there is reasonable likelihood of confusion of source, such that prospective purchasers or clients are likely to regard the name as indicating the source identified by the name...." *Bet-*

*ter Business Bureau, Etc. v. Chappell,* supra, at 515.

Apparently in a reaction to such cases, the trial court made findings to the effect that the business of the defendants will not be in competition with the business of the plaintiffs and there would be no confusion by the public between the two businesses. The defendants acknowledge the plaintiffs have acquired a "protectible interest in the name 'Mutton Hollow Craft Village.'" To sustain the judgment in their favor, the defendants rely upon the absence of competition between the parties and absence of confusion concerning the businesses. Such findings apparently formed a basis for the judgment of the trial court denying relief.

Even under the common law, the first of those findings is not relevant to the legal issues. "It is no longer necessary that the parties be engaged in competitive businesses ... or that an actual diversion of business be shown." *Thomas Patrick, Inc. v. KWK Inv. Co.,* supra, 206 S.W.2d at 360 (citation omitted).

The second of these findings is not responsive to the law declared in cases such as *Better Business Bureau, Etc. v. Chappell,* supra. The confusion referred to in such earlier cases is not confusion as to the businesses involved, but as to source or ownership. "[T]he confusion which a plaintiff must prove 'may be confusion to product source, or confusion to sponsorship or affiliation.'" *Midwest Research Institute v. S & B Promotions,* supra, at 1014. Also see *Beer Nuts, Inc. v. Clover Club Foods Co.,* 711 F.2d 934 (10th Cir.1983); *Saratoga Vichy Spring Co., Inc. v. Lehman,* supra.

There was direct evidence of confusion concerning the source of the defendants' enterprise. Without objection, editor Smith testified "there might be some confusion as to ... who the actual owner of the entity would be." Further, persons seeking information concerning the defendants had inquired of the plaintiffs' office. This actual confusion occurred even in advance of any publicity by the defendant using the name "Mutton Hollow." Moreover,

> "[n]or, as defendant Affiliate contends, is it prerequisite to injunctive relief in an action of this nature that there be proof of actual deception or that plaintiff has suffered actual damage or injury to good will. It is enough to show a probability that deception or confusion may result; such threatened future injury is sufficient basis for relief." *Missouri Fed. of Blind v. National Fed. of Blind, Etc.,* supra, at 6.

It is apparent there is a reasonable likelihood that the public would assume the source of the operation of RV lots, a campground and accommodations under the name "Mutton Hollow Land Development, Inc." or "Mutton Hollow R.V. Resort Association" was affiliated with the source of the *adjacent* commercial enterprise that had operated for seventeen years under the name "Mutton Hollow." "Although these names are not identical, '[s]imilarity will deceive almost as effectually as precise identity, and it is well known that nice and careful discrimination between names cannot be expected from a busy public.' *Furniture Hospital v. Dorfman, supra* [179 Mo.App. 302], l.c. 166 S.W. [861] at 863[6] [1914]." *Missouri Fed. of Blind v. National Fed. of Blind, Etc.,* supra, at 6. The finding there may not be confusion as to the source is against the greater weight of the evidence.

■ However, further discussion of the findings concerning competition and confusion is not necessary. The topics referred to in those findings are the subject of a statute of this state not cited by counsel nor acknowledged by the trial court.

> "Likelihood of injury to business reputation or of dilution of the distinctive quality of a ... trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." § 417.061. (emphasis added).

Section 417.061 is taken from the Model State Trademark Act. Similar statutes have been adopted in approximately seventeen states.

> "The statutes go further than the common law in that they provide protection

against the 'likelihood of dilution of the distinctive quality of a trade-name,' which includes not only distinctive and fancifully coined marks but secondary meaning words as well." Callmann, Unfair Comp., Trademarks & Monopolies § 21.11 (4th Ed.).

"The underlying rationale of the dilution doctrine is that the gradual diminution or whittling away of the value of a trade-mark, resulting from use by another, constitutes an invasion of the senior user's property right and good will in his mark and gives rise to an independent wrong. The wrong is dependent neither upon a showing of competitive relationship, nor that the goods are related, nor of a likelihood of confusion."
2 J. McCarthy, Trademarks and Unfair Competition § 24:13 (2d Ed.1984)

The term "Mutton Hollow" is a trade name for the commercial development of the plaintiffs, valid at common law. *Shrout v. Tines, supra.* "Hallmark Cards' trademark is both strong and distinctive, it has been in continual use and indicates the origin of goods from a particular source. Thus, Hallmark Cards' trademark is valid at common law." *Hallmark Cards, Inc. v. Hallmark Dodge, Inc.,* 634 F.Supp. 990, 1000 (W.D.Mo.1986). Under § 417.061 the plaintiffs "need not show either competition between itself and [defendants] or any customer confusion." *Hallmark Cards, Inc. v. Hallmark Dodge, Inc.,* supra, at 1000. Also see *Hyatt Corp. v. Hyatt Legal Services,* 736 F.2d 1153 (7th Cir.1984). Under the statute, dilution includes "a diminution in the uniqueness and individuality of the mark caused by another's use of the same or similar mark." *Wedgwood Homes, Inc. v. Lund,* 294 Or. 493, 659 P.2d 377, 382 (banc 1983).

The evidence established "Mutton Hollow" is a strong trade name in the area. The use of that name by the defendants will result in a dilution in the distinctiveness of Mutton Hollow as a trade name for the plaintiffs' commercial development. Cf. *Hyatt Corp. v. Hyatt Legal Services,* supra; *Wedgwood Homes, Inc. v. Lund,* supra. "Since plaintiff's mark has ac-

quired a secondary meaning, as discussed above, relief is also appropriate under Missouri's Anti–Dilution Statute." *Midwest Research Institute v. S & B Promotions,* supra, at 1017. This is true in this case.

There was evidence defendant had been and was involved in litigation which questioned his business practices. As stated, the trial court found "The good will of the Defendants' other businesses is irrelevant to the operation of the Defendants' land development in the 'Mutton Hollow'". Whether or not this was an erroneous declaration of the law under the common law of unfair competition need not be decided. It is an erroneous declaration of the law under § 417.061. However, because of the above determination concerning dilution, that evidence need not be recited at length or further considered.

Finding "22" of the trial court was: "Should the Defendants venture to conduct the same or similar business as the Plaintiffs, the Plaintiffs would have adequate remedies available to enjoin the Defendants and sue for unfair competition." This finding is actually a conclusion of law that the plaintiffs were entitled to injunctive relief but for the fact the business of the defendants was not in competition with that of plaintiffs. Finding 22 is a pointed demonstration the judgment of the trial court erroneously declared and applied the law. Under neither the common law, nor § 417.061 is such competition a prerequisite to that relief.

The defendants did not in the trial court and do not in this court suggest that injunctive relief, if granted, should be limited. Nonetheless, it must be noted that some cases have limited protection of a geographic term that has acquired a secondary meaning to a requirement that a second user, by an express disclaimer or otherwise, remove the possibility of the source of business activity. *Midwest Research Institute v. S & B Promotions,* supra. The reason for such a limitation on protection has been that " '... anyone who is in fact located in that place has a right to

tell purchasers of his location.' " *Id.* at 1015.

However, that reason has little weight in this case. As read in "The Shepherd of the Hills", the words "Mutton Hollow" conjure up a nostalgic vision of natural beauty and graceful, but simple, appreciative way of life. They do not appear upon the state highway map to provide prospective patrons information of its actual location. The topographic map does not serve that purpose. It is questionable if "Mutton Hollow" is a geographic term, in the sense those words are used in the law of unfair competition. That term falls within the following category:

> "The question of whether a geographical term is treated as such for the purposes of trademark law depends on the extent to which it is known as such in this country. It is doubtful whether a geographical word of ancient vintage, even though it still lives in usage and in the memory of the public, should be treated as primarily geographical, since 'time, tide and the relentless movement of the copyrighter's pen' may alter the primary significance of words that were once vested with geographical meaning only. Accordingly, past judicial comments on the geographic nature of a word may no longer be controlling today." Callmann Unfair Comp. Trademarks & Monopolies, § 18.15 (4th Ed.) (footnotes omitted).

Two other factors are relevant to the issue of such possible limitation. It would be extremely difficult if not impossible to use the words "Mutton Hollow" as a geographic term in a business name and avoid confusion with the commercial development on the adjacent tract. Further, the development planned by the defendants is not in the area described as "Mutton Hollow". For all the reasons stated, and in the light of the detrimental impact *any* second use could have, it is not appropriate to limit protection of plaintiffs' trade name "Mutton Hollow" against its use by the defendants. *Wedgwood Homes, Inc. v. Lund,* supra.

The plaintiffs, by their brief, request this court to remand the case for the ascertainment of their damages. In the trial court, the plaintiffs presented no evidence of the amount of monetary damage sustained by them. They are not entitled to a second trial to present evidence on an issue they had raised in their petition but upon which their proof failed. The request is denied.

Within the doctrine of *Murphy v. Carron,* supra, the judgment of the trial court is against the weight of the evidence and erroneously applies the law. It is reversed. The Rules prescribe that it is the duty of this court to give such judgment as the trial court ought to give and finally dispose of this case. Rule 84.14. Therefore, it is adjudged and decreed that the defendants are enjoined from using the name "Mutton Hollow". The costs are taxed against the defendants. That judgment becomes the judgment of the trial court as outlined in *Aetna Ins. Co. v. Hyde,* 327 Mo. 115, 34 S.W.2d 85 (banc 1930).

FLANIGAN, P.J., and HOGAN, J., concur.

PREWITT, J., recused.